















```
CAG   8/12/03    9:36
3:02-CV-00659   RICOTTA V. ALLSTATE  INSURANCE
*22*
*P/A.*
```

FILED

03 AUG 11 PM 2: 21

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

1  Peter H. Klee, State Bar No. 111707
   Ronald D. Getchey, State Bar No. 157213
2  Valerie R. Cardenas, State Bar No. 157031
   LUCE, FORWARD, HAMILTON & SCRIPPS LLP
3  600 West Broadway, Suite 2600
   San Diego, California 92101-3372
4  Telephone No.: 619.236.1414
   Fax No.: 619.232.8311
5
   Attorneys for Defendant ALLSTATE INSURANCE COMPANY
6

7

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11 LANCE RICOTTA, | Case No. CV 02-0659K (JFS) |
| 12      Plaintiff, | **POINTS AND AUTHORITIES IN** |
| | **SUPPORT OF DEFENDANT** |
| 13 v. | **ALLSTATE INSURANCE** |
| | **COMPANY'S MOTION FOR** |
| 14 ALLSTATE INSURANCE COMPANY, | **SUMMARY JUDGMENT OR, IN THE** |
|    and DOES 1 through 50, inclusive, | **ALTERNATIVE, PARTIAL** |
| 15 | **SUMMARY JUDGMENT** |
|      Defendants. | DATE:          September 15, 2003 |
| 16 | TIME:          11:00 a.m. |
| 17 | COURTROOM:  16 |
| 18 | Hon. Judith N. Keep |

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

2

**Page**

I.   INTRODUCTION..................................................................................1

II.  STATEMENT OF FACTS ....................................................................2
     A.   Ricotta discovers Poria eating his home .................................2
     B.   Ricotta makes a claim to Allstate...........................................3
     C.   Allstate investigates Ricotta's claim......................................3
     D.   Allstate denies Ricotta's claim...............................................4
     E.   Ricotta demands that Allstate reconsider its denial ...............5

III. BECAUSE RICOTTA'S POLICY EXPLICITLY EXCLUDED
     COVERAGE FOR LOSSES CAUSED BY OR CONSISTING OF
     DEFECTIVE CONSTRUCTION, WATER AND DRY ROT, RICOTTA'S
     LAWSUIT IS BARRED AS A MATTER OF LAW .................................6

IV.  THE COLLAPSE PROVISION DOESN'T AFFORD COVERAGE FOR
     RICOTTA'S LOSS .............................................................................9

V.   THE CONTRACTUAL ONE YEAR LIMITATIONS PERIOD BARS THIS
     ENTIRE LAWSUIT.........................................................................13

VI.  AT A MINIMUM, BECAUSE THERE WAS A GENUINE ISSUE AS TO
     COVERAGE, ALLSTATE IS ENTITLED TO PARTIAL SUMMARY
     JUDGMENT OF THE BAD FAITH CLAIM ........................................14

VII. EVEN IF PLAINTIFF COULD PROVE BAD FAITH, HE STILL
     CANNOT ESTABLISH A CLAIM FOR PUNITIVE DAMAGES.........................18

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.   CV-02-0659 K (JFS)

1

## **TABLE OF AUTHORITIES**

**Page**

2

3 ## CASES

4 ACL Technologies, Inc. v. Northbrook Prop. & Cas. Co.,
17 Cal.App.4th 1773 (1993) ...............................................................9, 13

5

6 Adams v. Allstate Ins. Co.,
187 F. Supp. 2d 1207, 1215 (C.D. Cal. 2002) ...................................16, 17

7 Allstate Ins. Co. v. Madan,
889 F.Supp. 374 (C.D. 1995) ..................................................................16

8

9 Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ................................................................................19

10 Beck v. State Farm,
54 Cal.App.3d 347 (1976).................................................................18, 19

11

12 Bell v. Sharp Cabrillo Hosp.,
212 Cal.App.3d 1034 (1989).....................................................................20

13 Board of Trustees of Univ. of Illinois v. Ins. Corp. of Ireland,
969 F.2d 329 (7th Cir. 1992).....................................................................19

14

15 Brodkin v. State Farm Fire & Casualty Company,
217 Cal.App.3d 210 (1989).........................................................................7

16 Cardiner v. Provident Life & Accident Ins. Co.,
158 F. Supp. 2d 1088 (C.D. Cal. 2001) ...................................................15

17

18 Chateau Chamberay Homeowners Assn. v. Associated International Ins. Co.,
90 Cal. App. 4th 335 (2001) ..............................................................15, 16

19 Dalrymple v. United Services Auto Assn.,
40 Cal.App.4th 497, 46 Cal.Rptr.2d 845 (1995)......................................15

20

21 Doheny West Homeowners' Assn. v. American Guarantee & Liability Ins. Co.,
60 Cal.App.4th 400 (1997)..........................................................10, 11, 12

22 Fraley v. Allstate Ins. Co.,
81 Cal. App. 4th 1282 (2000) ............................................................15, 16

23

24 Frazier v. Garrison I.S.D.,
980 F.2d 1514 (5th Cir. 1993)..................................................................19

25 Guebara v. Allstate Ins. Co.,
237 F.3d 987 (9th Cir. 2001)....................................................................16

26

27 In re Angelia P.,
28 Cal.3d 908 (1981).................................................................................19

28

Kendall Yacht Corp. v. United Cal. Bank,
    50 Cal.App.3d 949 (1975)..........................................................................................20

Lawrence v. Western Mut. Ins. Co.,
    204 Cal.App.3d 565 (1988)...............................................................................13, 14

National Ins. Underwriters v. Carter,
    17 Cal.3d 380 (1976)...................................................................................................7

O'Hara v. Western Seven Trees Corp.,
    75 Cal.App.3d 798 (1977).........................................................................................20

Paine v. Allstate Ins. Co.,
    1996 U.S. Dist. LEXIS 6407 (C.D. Cal. 1996).........................................................17

Patrick v. Maryland Casualty Co.,
    217 Cal.App.3d 1566 (1990).....................................................................................20

Phelps v. Provident Life & Accid. Ins. Co.,
    60 F. Supp. 2d 1014 (C.D. Cal. 1999) .....................................................................15

Prieto v. State Farm Fire & Cas. Co.,
    225 Cal.App.3d at 1192 (1990).................................................................................14

Prudential-LMI Com. Ins. v. Superior Court,
    51 Cal.3d 674 (1990)........................................................................................13, 14

Rigas v. Allstate Ins. Co.,
    1998 U.S. Dist. LEXIS 6192  (C.D. Cal. 1998)........................................................17

Rosen v. State Farm General Insurance Co.,
    30 Cal.4th 1070 (2003) ....................................................................................10, 12

Sanchez v. South Hoover Hospital,
    18 Cal.3d 93 (1976)..................................................................................................14

Shade Foods, Inc. v. Innovative Product Sales & Marketing,
    78 Cal.App.4th 847 (2000) ................................................................................18, 19

Shell Oil v. Winterthur Swiss Ins. Co.,
    12 Cal.App.4th 715 (1993)................................................................................9, 13

Stanton Road Assoc. v. Pacific Employers Ins. Co.,
    36 Cal.App.4th 333 (1995).......................................................................................13

State Farm Fire & Cas. Co. v. Superior Court,
    210 Cal.App.3d 604 (1989).......................................................................................14

State Farm Fire & Casualty Co. v. Martin,
    872 F.2d 319 (9th Cir. 1989)......................................................................................7

Stewart v. Truck Ins. Exch.,
    17 Cal.App.4th 468 (1993) ...........................................................................18, 19, 20

Case No.   CV-02-0659 K (JFS)

Tomaselli v. Transamerica Ins. Co.,
    25 Cal.App.4th 1269, 31 Cal.Rptr.2d 433 (1994)................................................18, 20

Yoshida v. Liberty Mutual Ins. Co.,
    240 F.2d 824 (9th Cir. 1957)..........................................................................................7

Ziganto v. Taylor,
    198 Cal.App.2d 603 (1961)..........................................................................................14

## STATUTES

Cal. Civ. Code
    section 3294(c) ...........................................................................................................20

Cal. Civ. Code
    section 3294(c)(1) .......................................................................................................20

Insurance Code
    section 2070 ................................................................................................................13

Insurance Code
    section 2071 ................................................................................................................13

Case No.   CV-02-0659 K (JFS)

## I.    INTRODUCTION

This lawsuit arises out of plaintiff Lance Ricotta's homeowners claim to Allstate for dry rot damage caused by a wood-eating fungus known as *Poria incrassata*.  Allstate hired a structural engineer, who inspected the damage.  The engineer concluded that the *Poria* was caused by water intrusion resulting from defective construction.  Thus, Allstate denied the claim based on, among other exclusions, exclusions for construction defect, water and dry rot.  Allstate also advised Ricotta of his policy obligation to protect the property against further loss.

Six months later, after doing nothing to repair or to control the spread of the dry rot, and after retaining an attorney to represent him, Ricotta suddenly claimed that his home was then in a state of "collapse."  He thus argued that his loss was covered by the "collapse" provision in his policy.  After confirming that no part of the house had collapsed, or was in danger of imminent collapse when he had made his claim several months earlier, Allstate reaffirmed its denial.

Ricotta then filed this lawsuit, claiming Allstate breached the contract and acted in bad faith by denying his claim.  Based on the opinion of his expert, Ricotta now appears to be arguing that there is coverage for his claim because his house purportedly was in a "state of collapse" as of August 27, 2002 – *twenty- two months after he made his claim.*  However, Ricotta's "collapse" argument fails as a matter of law for three reasons.

First, the policy covers only collapse caused by a "hidden" decay.  Apart from the fact that the house hadn't collapsed as of August 27, 2002, even if it had, as of that date the decay undisputedly was not "hidden."  On the contrary, Ricotta discovered it in October 2000, when he reported his claim.  Therefore, any collapse then would not be covered.

Moreover, for the collapse coverage to apply, the policy plainly states that the collapse must be "sudden and accidental."  There is nothing "sudden and accidental" about a collapse that occurred almost two years after the decay was apparent.  For this additional reason, there wouldn't be coverage.

///

1                                             Case No.   CV-02-0659 K (JFS)

1    Moreover, Allstate's policy specifically excludes coverage for losses caused by the

2  insured's failure to take all reasonable steps to preserve the property.  Because Ricotta

3  undisputedly did nothing to protect his property against collapse for *twenty-one months*

4  after his claim was denied,[1] his claim and lawsuit are barred for this reason as well.

5    Ricotta's lawsuit suffers from yet another fatal defect:  it is absolutely barred by the

6  contractual one-year limitations provision.  Under the policy, Ricotta was required to file

7  any suit arising out of his claim within one year after the inception of his loss.  He failed to

8  do so.

9    Regardless of how the Court decides Allstate's coverage and limitations defenses,

10  Ricotta's bad faith claim fails as a matter of law.  Based on the information Allstate had

11  received and the conclusions of its expert, there was, at a minimum, a genuine issue as to

12  whether Ricotta's claim was covered.  As a matter of law, the existence of a genuine issue

13  as to coverage precludes liability for bad faith.  Accordingly, at the very least, Allstate is

14  entitled to partial summary judgment as to the bad faith claim.

15    Finally, Ricotta's punitive damage claim fails because there is no evidence — let

16  alone clear and convincing evidence — of malice, oppression or fraud.

17    Accordingly, the Court should grant Allstate's motion for summary judgment or, in

18  the alternative, partial summary judgment.

19  **II.    STATEMENT OF FACTS**

20    **A.    Ricotta discovers *Poria* eating his home**

21    Before or between October 14 and 16, 2000, Ricotta discovered a mushroom-

22  looking fungus eating the walls and flooring in his home.  (Jewett Decl., ¶ 6; Allstate's

23  Index of Exhibits ("IOE"), Ex. 12; Ex. 18)  On October 17, 2000, he called Lloyd's Pest

24  Control.  (Allstate's IOE, Ex. 17, pp. 253-254)  On October 19, 2000, Lloyds inspected the

25  damage and confirmed that there was a wood eating fungus in various locations in the

26  interior of the home, as well as in the attic and the exterior.  (IOE, Ex. 17, pp. 253-257)

27  _____

[1] In July 2002, Ricotta superficially did some shoring.  However, his own expert
28  acknowledges that the shoring was deficient.

1

**B.    Ricotta makes a claim to Allstate**

2    Five days later, on October 19, 2000, Ricotta reported a claim to Allstate.  He said

3    that there was a fungus in his home, which was eating the walls and hardwood flooring and

4    which was destroying the carpets.  He also said that his home had been inspected by

5    Lloyd's Pest Control, which had confirmed that a fungus was eating his home.  (Jewett

6    Decl., ¶ 4; Allstate's IOE, Ex. 12)  The claim was assigned to Allstate adjustor, Margie

7    Jewett.  (Jewett Decl., ¶ 5)

8    On October 21, 2000, Ms. Jewett spoke to Ricotta.  He told her that he had first

9    noticed the damage about five days earlier.  He said that a termite company told him that

10    the fungus could be *Poria incrassata* and that he should call a specialist.  (Jewett Decl.,

11    ¶ 6)

12    Ms. Jewett advised Ricotta that his policy contained an exclusion for dry rot.  She

13    further advised him that, subject to a reservation of rights, she would retain an engineer to

14    inspect his property and that the engineer would be contacting him to set an appointment

15    for an inspection.  (Jewett Decl., ¶ 7)

16    **C.    Allstate investigates Ricotta's claim**

17    Ms. Jewett sent Ricotta a reservation of rights letter.  (Jewett Decl., ¶ 8; Allstate's

18    IOE, Ex. 1)  She also retained a structural engineering company, Earthquake Engineering,

19    to determine the cause and origin of the damage.  (Jewett Decl., ¶ 8)

20    For about a month, Earthquake Engineering tried unsuccessfully to schedule an

21    inspection of the property.  On November 21, 2001, Ricotta finally permitted Earthquake

22    Engineering to inspect his residence.  (Jewett Decl., ¶ 9; Allstate's IOE, Ex. 2. pp. 45-49)[2]

23    On November 27, 2000, Earthquake Engineering called Allstate and reported its

24    preliminary findings.  It said that the grading next to the house had been recently altered

25    / / /

26

27    _____

[2] Ricotta also repeatedly told Allstate that he had a report from his own engineer
concerning the cause of the damage.  Despite repeated efforts by Allstate to obtain the
28    report, however, Ricotta refused to provide it.  (Jewett Decl., ¶ 9; Allstate's IOE, Ex. 14)

1   and that it needed to conduct destructive testing – *i.e.*, open the exterior wall of the kitchen

2   – to determine the nature and extent of the damage.  (Jewett Decl., ¶ 10; Ex. 13, p. 238)

3        On December 16, 2000, Earthquake Engineering completed the destructive testing.

4   It advised Allstate that:  (1) the interior walls had been opened for sampling; (2) the

5   samples had been sent to a laboratory for testing; and (3) it would prepare their report after

6   the lab results were available.  (Jewett Decl., ¶ 10; Allstate's IOE, Ex. 13, p. 239)

7        In early January 2001, Allstate received Earthquake Engineering's report.  (Jewett

8   Decl., ¶ 11; Allstate's IOE, Ex. 2)  Earthquake Engineering concluded that:  (1) the

9   damage to the property had resulted from a fungus known as *Poria incrassata*; (2) the

10  fungus had affected the structural integrity of the wall that separates the living room from

11  the kitchen; (3) the damage observed was consistent with substandard construction; and (4)

12  the fungus was caused by:  (i) the use of untreated wood during construction and the

13  absence of a proper barrier between the untreated wood framing and the foundation and (ii)

14  improper grading and water control.  (Allstate's IOE, Ex. 2, pp. 9, 15-16)  Earthquake

15  Engineering also concluded that, although the structure had been somewhat compromised,

16  there were no signs of imminent collapse either of the house or any of its sections.  Id.

17      **D.**    **Allstate denies Ricotta's claim**

18       On January 17, 2001, based on the information it had received and the Earthquake

19  Engineering report, Allstate determined that there was no coverage for the damage to

20  Ricotta's house.  (Jewett Decl., ¶ 12)

21       On January 19, 2001, Allstate informed Ricotta that his claim wasn't covered.

22  Ricotta requested that his claim be reviewed by Ms. Jewett's supervisor, Dick Ray.

23  (Jewett Decl., ¶ 13; Allstate's IOE, Ex. 15)

24       On January 23, 2001, Ricotta spoke with Mr. Ray and said he had reports that

25  would disprove Allstate's findings.  Mr. Ray asked him to provide those reports, but

26  Ricotta refused.  (Jewett Decl., ¶ 14; Allstate's IOE, Ex. 16)

27  ///

28  ///

1    On January 24, 2001, Allstate sent Ricotta a letter formally denying his claims.

2 (Jewett Decl., ¶ 15; Allstate's IOE, Ex. 3) In addition to stating the grounds for denial, the

3 letter recited the policy's one-year limitations period. (Allstate's IOE, Ex. 3, p. 58)

4    **E.    Ricotta demands that Allstate reconsider its denial**

5    For the next six months, Ricotta did nothing to control the spread of or to repair the

6 dry rot damage. (Allstate's IOE, Ex. 11, p. 157-158; Ex. 18, p. 268-270) Instead, on July

7 16, 2001, he retained attorney James Fredricks of Goeltz & Fredricks LLP to represent

8 him. Mr. Fredricks wrote Allstate, stating that, at that point, (1) Ricotta was having "a

9 problem with a collapse of his home" and (2) an engineer had determined that Ricotta's

10 house was probably in a state of collapse, but that further destructive testing was necessary

11 to make that determination. (Allstate's IOE, Ex. 4)

12    On July 26, 2001, Ms. Jewett wrote Mr. Fredricks that Allstate was willing to

13 review any additional reports or information that Ricotta had and to reconsider its position.

14 (Allstate's IOE, Ex. 5)

15    On July 27, 2001, Mr. Fredricks sent Allstate a copy of the April 2002 engineering

16 report that Ricotta had obtained from Engineering Design Group. (Jewett Decl., ¶ 18;

17 Allstate's IOE, Ex. 6) Contrary to Frederick's representation concerning its contents, the

18 report simply stated that although Engineering Design found that "vertical studmembers

19 had been weakened," "the full extent of the damage could not be established without

20 further destructive testing." Nowhere in the report did Engineering Design conclude that

21 the house had collapsed or even that it was in danger of imminent collapse. (Id. at p. 67)

22    On August 3, 2001, Allstate sent a copy of the Engineering Design report to

23 Earthquake Engineering for review and comment as to whether the information contained

24 in that report caused Earthquake Engineering to amend its conclusions in any way. (Jewett

25 Decl., ¶ 19)

26    On August 13, 2001, Earthquake Engineering advised Allstate that the Engineering

27 Design report provided no basis for amending its original recommendations and

28 / / /

5    Case No.   CV-02-0659 K (JFS)

1   conclusions.  (Jewett Decl., ¶ 19; Allstate's IOE, 7)  On August 17, 2001, Allstate

2   conveyed this information to Fredericks.  (Jewett Decl., ¶ 19)

3        Thereafter, Fredricks advised Allstate that Ricotta was not asking for a coverage

4   determination, but for completion of additional destructive testing to determine whether his

5   house was at that time in danger of imminent collapse.  Allstate asked Earthquake

6   Engineering whether additional destructive testing was necessary to evaluate the condition

7   of Ricotta's home when he made the claim, and Earthquake Engineering concluded it was

8   not.  (Jewett Decl., ¶ 20; Allstate's IOE, Ex. 8)

9        On October 1, 2001, Allstate wrote Fredricks advising him that there was no

10  evidence of an imminent collapse of the house at the time of their inspections and there

11  was no basis for any additional destructive testing of the house.  (Jewett Decl., ¶ 20;

12  Allstate's IOE, Ex. 9)

13       On January 24, 2002, plaintiff filed the lawsuit in this case.  (Complaint)

14  **III.  BECAUSE RICOTTA'S POLICY EXPLICITLY EXCLUDED COVERAGE
       FOR LOSSES CAUSED BY OR CONSISTING OF DEFECTIVE
15     CONSTRUCTION, WATER AND DRY ROT, RICOTTA'S LAWSUIT IS
       BARRED AS A MATTER OF LAW**

16

17       Ricotta's policy provides:

18       *Losses We Do Not Cover Under Coverages A and B:*  We do not cover loss
         to the property described in Coverage A--Dwelling Protection or Coverage
19       B--Other Structures Protection consisting of or caused by:

20       22.   Planning, Construction or Maintenance, meaning faulty, inadequate or
         defective:
21
         (b)   design, specifications, workmanship, repair, construction, renovation,
22       remodeling, grading, compaction.  [Allstate's IOE, Ex. 10. p. 106, 108]

23  Ricotta's policy further provides:

24       *Losses We Do Not Cover Under Coverages A and B:*  We do not cover loss
         to the property described in Coverage A--Dwelling Protection or Coverage
25       B--Other Structures Protection consisting of or caused by:

26       4.   Water or any other substance on or below the surface of the ground,
         regardless of its source. This includes water or any other substance which
27       exerts pressure on, or flows, seeps or leaks through any part of the residence
         premises.  [Id. at p. 106]
28

1  The policy further provides:

2      In addition, we do not cover loss consisting of or caused by any of the
       following:
3
       15 d) rust or other corrosion, mold, wet or dry rot. [Id. at p. 107]
4

5      "An insurance company has a right to limit the coverage of a policy issued by it and

6  when it has done so, the plain language of the limitation must be respected." National Ins.

7  Underwriters v. Carter 17 Cal.3d 380, 386 (1976) (quoting Continental Casualty Co. v.

8  Phoenix Construction Co., 46 Cal.2d 423 (1956)); accord State Farm Fire & Casualty Co.

9  v. Martin, 872 F.2d 319, 321 (9th Cir. 1989)  (same); Yoshida v. Liberty Mutual Ins. Co.,

10 240 F.2d 824, 826-27 (9th Cir. 1957).

11     The foregoing plain language of the policy separately precludes coverage for (1)

12 losses caused by negligent construction; (2) losses consisting of or caused by water; and

13 (3) losses consisting of mold, wet and dry rot.[3]  See Brodkin v. State Farm Fire & Casualty

14 Company, 217 Cal.App.3d 210, 217-218 (1989) (holding that the construction defect

15 exclusion is clear and unambiguous).

16     Here, as set forth in the Earthquake Engineering report, Ricotta's loss was caused

17 by water intrusion and construction defect.  Allstate's expert, John Price, a registered civil

18 and structural engineer, confirmed this:

19     [T]he wood rot emanates from the base of the south wall of the living room.
       The wood and masonry in this area appeared to be damp at the time of my
20     inspection. . . . In this area, there is a brick masonry retaining wall or curb which
       separates the wood framing of the wall from the exterior grade of the soil. The soil
21     grade is higher than the sill plate of the wall.  Brick masonry and its mortar joints
       are relatively porous materials, and there is no visible waterproofing to either the
22     exterior or interior of the masonry wall or to the masonry concrete joint.
23
       Furthermore, the flashing between the stucco and top of the masonry wall
24     has several shortcomings, any one combination of which would allow water to
       enter.  The flashing does not cover the entire top of the masonry wall. There is no
25     adequate seal between the underside of the flashing and masonry; rather there is a
26

27 ──────────────
   [3] Because Poria is a fungus, which is a plant, coverage is also precluded by the exclusion
28 15 (c) for losses caused by or consisting of "plants." (Allstate's IOE, Ex. 10, p. 107)

                                                7                Case No.   CV-02-0659 K (JFS)

gap.  The flashing is not adequately lapped or sealed at its joints/laps.  There is no counterflashing or return flashing at the end of the flashing where it runs into the wall at the living room to kitchen corner (alcove area).  This zone of the living room wall, reportedly, previously been measured to have one of the highest wood moisture contents.

      As noted on footing Section A, the exterior grade of the soil is above the level of wood sill plate rather than 6" below Building Code.  In the exterior alcove/recess between the living room and the kitchen, the exterior grade of the soil is higher (relative to the wood framing) than the 6" minimal vertical separate of the Building Code.  These factors significantly affect moisture intrusion/migration into the wood framing.  Earthquake Engineering, Inc. report that the exterior grade was higher yet immediately prior to their first site inspection in November 2000 and may have been adjusted prior to November 21, 2000.  The soil grade as of July 2002 remained higher than Building Code minimum clearances.  [Allstate's IOE, Ex. 11; p. 158; emphasis added.]

Likewise, this conclusion was confirmed by James Mosier, Allstate's contractor and mold remediation expert:

Numerous exterior conditions or defects were noted in the area of the *Poria* contaminated wall that could lead to water intrusion with the wall cell or through existing sill plates.

Defective construction practices were noted along the living room south wall.  Most notably the lack of pressure treated wood sill plates and direct soil to wood contacts.  The soil was wet to the touch in all cell areas where the soil was in direct contact with the sill plate.

The area of *Poria* contamination along the south wall of the living room is a separate occurrence related to improper construction and wet or damp soil in areas directly in contact with wood framing.  The *Poria* most likely has a water source located within the soil that is attached to the planter box area. [Allstate's IOE, Ex. 19, p. 284-285]

Ricotta does not even attempt to refute the conclusions of these experts as to causation, because he cannot.  Indeed, out of the four experts he has designated, not surprisingly, not one has been designated to opine as to causation.  (Allstate's IOE, Ex. 20, p. 316; Exs. 21-25;)[4]

---

[4] Ricotta initially claimed that his loss was caused by a leaky hose bib.  However, after several experts refuted this theory (see IOE, Exs. 2, 11, 19), Ricotta apparently abandoned this position.  Not a single one of Ricotta's experts in this lawsuit opines on causation at all, much less that a leaky hose bib caused the loss.  (See IOE, Ex. 20, p. 316; Exs. 21-25)  Moreover, the pipe leak allegedly occurred on October 14, 2000.  (See Complaint, ¶ 7)  However, because Ricotta did not sue Allstate until more than a year after the leak occurred, his claim still would be barred by the policy's one-year provision.  See infra, Section V.  Moreover, to the extent there was a continuous leak allowing *Poria* to grow

1   Moreover, not only was coverage for Ricotta's damage excluded, there was never

2   coverage in the first place.  Ricotta's policy provides:

3   We will cover **sudden** and accidental direct physical loss to property
     described in Coverage A--Dwelling Protection and Coverage B--Other
4    Structures Protection except as limited or excluded in this policy.  [Allstate's
     IOE, Ex. 10, p. 105; emphasis added]
5

6   Defective construction is not a "sudden" loss within the meaning of the insurance

7   policy.  Shell Oil v. Winterthur Swiss Ins. Co., 12 Cal.App.4th 715, 755 (1993) ("in the

8   phrase, 'sudden and accidental,' 'accidental' conveys the sense of an unexpected and

9   unintended event, while 'sudden' conveys the sense of an unexpected event that is abrupt or

10  immediate in nature")(emphasis added); ACL Technologies, Inc. v. Northbrook Prop. &

11  Cas. Co., 17 Cal.App.4th 1773, 1787 (1993)  ("[g]iving 'sudden' a meaning independent of

12  'accidental,' therefore requires giving it a meaning with a temporal aspect--immediacy,

13  quickness or abruptness--that does not allow it to cover events, such as happened in this

14  case--that occurred gradually").  There is nothing "quick," "immediate," and "abrupt"

15  about constructing a home, defectively or otherwise.  Nor is there anything sudden or

16  accidental about two year's worth of unabated dry rot.

17  **IV.   THE COLLAPSE PROVISION DOESN'T AFFORD COVERAGE FOR
        RICOTTA'S LOSS**
18

19  Because Ricotta's loss was excluded by multiple provisions in the policy, six

20  months after Allstate denied the claim, Ricotta began contending that that his house then

21  was in a state of "collapse."  However, his reliance on the collapse provision is misplaced.

22  The policy provides:

23      12.    Collapse

24      We will cover:

25      a) the **entire** collapse of a covered building structure;

26      b) the **entire** collapse of part of a covered building structure; and

27  _____
    over an extended time, the loss also would be precluded under exclusion 18 for "leakage
28  and seepage of water" for a period of weeks or months.  See Ex. 10, p. 108.

9                  Case No.   CV-02-0659 K (JFS)

1    c) direct physical loss to covered property caused by (a) or (b) above.

2    For coverage to apply, the collapse of a building structure specified in (a) or
     (b) above must be **sudden and accidental** direct physical loss caused by one
3    or more of the following: . . .

4         b) **hidden** decay of the building structure ;

5    **Collapse does not include settling, cracking, shrinking, bulging or
     expansion.** [Allstate's IOE, Ex. 10, p. 118; emphasis added.]
6

7    As a matter of law, Ricotta's collapse argument fails for three reasons.

8         First, the plain meaning of the above provision is that all or part of the building

9    must *entirely* collapse.  Settling, cracking, shrinking, bulging or expansion is not enough.

10   Here, it is undisputed that when Ricotta reported his claim to Allstate, none of building had

11   collapsed.  (Allstate's IOE, Ex. 2, p. 17; Ex. 7, p. 70; Ex. 8; Ex. 11, pp. 156-159)

12        Moreover, where, as here, the policy language requires an entire or actual collapse,

13   it is not enough simply to show that collapse is imminent.  The collapse must have

14   occurred.  Rosen v. State Farm General Insurance Co., 30 Cal.4th 1070, 1074-1080 (2003).

15        In Rosen, the insurer denied the insured's claim for collapsed decks on the ground

16   that they hadn't actually collapsed.  The insured argued that, for coverage under the policy,

17   it was enough that their collapse was "imminent."  Reversing the California appellate

18   court, the California Supreme Court rejected this contention.  The Court held that the

19   policy defined collapse as "actually fallen down or fallen into pieces," not "settling,

20   cracking, shrinking, bulging, expansion, sagging or bowing," that the policy language was

21   "clear and explicit," that "under no stretch of the imagination does it mean imminently,"

22   and that courts will not "rewrite any provision of any contract, including the standard

23   policy underlying the individual policy, for any purpose."  Id. at 1078.

24        In reaching this result, the California Supreme Court distinguished the Rosen policy

25   from the policy in Doheny West Homeowners' Assn. v. American Guarantee & Liability

26   Ins. Co, 60 Cal.App.4th 400 (1997), where the court held there was coverage for imminent

27   collapse:

28   / / /

                                   10              Case No.   CV-02-0659 K (JFS)

1    Unlike the policy in this case, the *Doheny West* policy did not specify that
     the reach of the term collapse was restricted to *actual* collapse. Instead, the
2    *Doheny West* policy excluded coverage for collapse except "for loss or
     damage caused by or resulting from risks of direct physical loss involving
3    collapse of a building or any part of a building" resulting from specified
     causes. (*Doheny West, supra*, 60 Cal.App.4th at p. 402.) While the *Doheny*
4    *West* trial court held that this language embraced imminent as well as actual
     collapse, the trial court found for the defendant insurer on the ground the
5    plaintiff homeowners association had not met its burden of proving that any
     part of the building was in a state of imminent collapse. (*Id.* at p. 403.)
6
     The Court of Appeal affirmed. Noting that its task was not merely to
7    construe the word collapse in isolation, but rather to construe the total
     coverage clause, the Court of Appeal held that the coverage clause before it
8    "cannot be said to be clear, explicit, and unambiguous, and thus must be
     interpreted to protect the objectively reasonable expectations of the insured.
9    [Citation.]" (*Doheny West, supra*, 60 Cal.App.4th at p. 405.) With these
     principles in mind, the Court of Appeal stated: "It is undisputed that the
10   clause covers 'collapse of a building,' that is, that there is coverage if a
     building falls down or caves in. However, the clause does not limit itself to
11   'collapse of a building,' but covers 'risk of loss,' that is, the threat of loss.
     Further, on its terms it covers not only loss resulting from an actual collapse,
12   but loss 'involving' collapse. Thus, with the phrases 'risk of loss,' and
     'involving collapse,' the policy broadens  coverage beyond actual collapse."
13   (*Ibid.*, fn. omitted.)

14   However, the Court of Appeal rejected the plaintiff's contention that the
     policy phrases in question "broadened coverage to the extent that the clause
15   covers 'substantial impairment of structural integrity.'" (*Doheny West, supra*,
     60 Cal.App.4th at p. 405.) The Court of Appeal concluded that the trial court
16   had correctly interpreted the policy language before it "by requiring that [the]
     collapse be actual or imminent." (*Id.* at p. 406, fn. omitted.) "This
17   construction of the policy," the Court of Appeal observed, "avoids both the
     absurdity of requiring an insured to wait for a seriously damaged building to
18   fall and the improper extension of coverage beyond the terms of the policy,
     and is consistent with the policy language and the reasonable expectations of
19   the insured." (*Ibid.*)

20   We agree with the Court of Appeal that *Doheny West* is distinguishable from
     this case. As the Court of Appeal observed: "It is a well-established rule that
21   an opinion is only authority for those issues actually considered or decided.
     At no time did the court in *Doheny [West]* hold that an unambiguous
22   collapse provision expressly limiting recovery to actual collapse must
     nevertheless be construed to provide coverage for imminent collapse. The
23   court also did not purport to discern a public policy establishing a contractual
     entitlement to coverage for imminent collapse in all cases. It simply
24   construed the ambiguous collapse provision before it, as it was required to
     do.  In so doing, it was required to resolve the ambiguity in favor of the
25   insured and in accordance with the reasonable expectations of the insured.
     [Citations omitted.]  In construing the collapse provision in Doheny [West]
26   to provide coverage for both actual and imminent collapse, the court
     expressly relied on the broad language of that particular policy. Specifically,
27   the court held that the 'phrases "risk of loss," and "involving collapse"'
     effectively 'broadened coverage beyond actual collapse.' The State Farm
28   collapse provision at issue in this case, however, does not contain any

                                   11                    Case No.  CV-02-0659 K (JFS)

1  comparable language that can be construed to extend coverage beyond actual
2  collapse." [Some citations omitted.]

3     Just as the policy in <u>Rosen</u> required "actual" collapse, the policy here required
4  "entire collapse of all or part of the building," not merely shrinking, bulging, etc.  There is
5  only one meaning that can be ascribed to this provision and that is that all or part of the
6  building *entirely* collapsed.

7     Indeed, <u>Rosen</u> specifically held that <u>Doheny</u> was inapplicable because the State
8  Farm policy at issue in <u>Rosen</u> did not have the phrases "risk of loss," and "involving
9  collapse," that the <u>Doheny</u> court held "effectively broadened coverage beyond actual
10  collapse."   Just as the State Farm policy did not contain this terminology, neither does
11  Ricotta's policy.  <u>Doheny</u> therefore is inapposite.

12     Moreover, even assuming Ricotta's policy did cover imminent collapse, there still
13  wouldn't be coverage for Ricotta's claim.  That is because when his claim was denied, no
14  part of his home was even in danger of imminent collapse.  (Allstate's IOE, Ex. 2, p. 17;
15  Ex. 7, p. 70; Ex. 8; Ex. 11, pp. 156-159)

16     Indeed, apparently recognizing that there was no coverage for his claim at the time
17  it was denied, Ricotta claims that there is coverage now because, two years later, his home
18  has collapsed.  However, this argument also fails.  First, there is no evidence the home
19  collapsed.  His own expert states only that, as of August 27, 2002, the home was in danger
20  of imminent collapse.  (Allstate's IOE, Ex. 21, p. 323; Ex. 20, p. 317)  Moreover, even if
21  the home had collapsed (Allstate's expert refutes this), there would be no coverage.

22     As demonstrated above, the policy only provides coverage for collapse caused by
23  "hidden" decay.  However, Ricotta admittedly knew about the decay in October 2000.
24  (Jewett Decl., ¶ 4-6; Allstate's IOE, Ex. 12, p. 235)  Therefore, any collapse after that
25  point would not be the result of "hidden" decay, and thus would not be covered.

26     Indeed, to hold otherwise would be to do indirectly that which the California
27  Supreme Court in <u>Rosen</u> refused to do directly, *i.e.*, to rewrite the policy to cover imminent
28  collapse.  An insured faced with an excluded loss would simply have to wait until his

1  entire home collapsed to tender a claim to an insurer.  That result is exactly what the

2  "hidden" decay language and the provision requiring the insured to protect the home

3  against further loss were designed to protect against.

4         Moreover, the policy further requires that the collapse be "sudden and accidental."

5  However, there is nothing "sudden and accidental" about collapse that occurs almost two

6  years after the decay is discovered.  See Shell, supra, 12 Cal.App.4th at 755 (holding that

7  sudden means abrupt); ACL, supra, 17 Cal.App.4th at 1787 (same).

8         Additionally, the policy explicitly excludes coverage for losses resulting from an

9  insured's failure to take reasonable steps to protect his property.  (Allstate's IOE, Ex. 10, p.

10  7)  To the extent a collapse occurred, it is because Ricotta did nothing to prevent further

11  damage.  He undisputedly didn't do any repairs until some shoring almost two years after

12  the claim was denied.  (Allstate's IOE, Ex. 18, p. 268-269; Ex. 11, p. 157)  And even his

13  own expert acknowledges the shoring effort was deficient.  (Allstate's IOE, Ex. 21, p. 323)

14  Accordingly, the loss would also be excluded under this policy provision.

15         Because there is no coverage for Ricotta's loss, as demonstrated above, Allstate

16  cannot be held liable on any of Ricotta's claims.

17  **V.    THE CONTRACTUAL ONE-YEAR LIMITATIONS PERIOD BARS THIS ENTIRE LAWSUIT**

18
          Plaintiff's policy provides:
19

20         **12. Suit Against Us**: No suit or action may be brought against us unless
          there has been full compliance with all policy terms.  Any suit or action must
21         be brought within one year after the inception of loss or damage.

22  (Allstate's IOE, Ex. 10, p. 7; emphasis added.)  This provision is a mandatory term

23  required by Insurance Code sections 2070 and 2071.  Stanton Road Assoc. v. Pacific

24  Employers Ins. Co., 36 Cal.App.4th 333, 338 & n. 2 (1995); Lawrence v. Western Mut.

25  Ins. Co., 204 Cal.App.3d 565, 570 n. 2 (1988); Prudential-LMI Com. Ins. v. Superior

26  Court, 51 Cal.3d 674 (1990).

27         This statutory requirement represents the legislature's determination of a reasonable

28  period within which a suit must be brought by an insured against the insurer, and has

                                      13              Case No.   CV-02-0659 K (JFS)

1  consistently been upheld as valid and enforceable. Prudential-LMI 51 Cal.3d at 682-83;

2  Lawrence, 204 Cal.App.3d at 571; Prieto v. State Farm Fire & Cas. Co., 225 Cal.App.3d at

3  1192 (1990).

4          The one-year time period begins running on the date the loss becomes manifest--

5  that is, "when appreciable damage occurs and is or should be known to the insured, such

6  that a reasonable insured would be aware that his notification duty under the policy has

7  been triggered." Prudential-LMI, 51 Cal.3d at 686-87.

8          Here, Ricotta irrefutably knew about the wood-eating fungus on October 17, 2000,

9  when he hired a termite inspector to inspect the damage.  Indeed, he initially told Allstate

10  that he had discovered the damage five days before he reported his October 19, 2000 claim

11  to Allstate, and thus by October 14, 2000.  Later, he told Ms. Jewett he discovered it on

12  October 16, 2000, still prior to the Lloyd's inspection date of October 17, 2000.  The one

13  year period was then tolled on October 19, 2000 until Allstate denied the claim on January

14  24, 2001.  Because Ricotta did not sue Allstate until January 2, 2002 – *a year and three to*

15  *five days after the loss had manifested*, his entire lawsuit is barred by the one-year

16  limitations period.  Time limits are routinely upheld, regardless of how soon after their

17  expiration a claim is filed.  See Ziganto v. Taylor, 198 Cal.App.2d 603, 610 (1961)

18  (complaint time-barred because it was filed one day after agreement to extend time

19  expired); Sanchez v. South Hoover Hospital, 18 Cal.3d 93, 97, 103 (1976) (plaintiff's

20  "meritorious claim" barred because it was filed 13 days after the statute of limitations

21  expired); State Farm Fire & Cas. Co. v. Superior Court, 210 Cal.App.3d 604, 612 (1989)

22  ("Statutes of limitations are upheld regardless of hardship or of the underlying merits of

23  the claim.").

24  **VI.  AT A MINIMUM, BECAUSE THERE WAS A GENUINE ISSUE AS TO COVERAGE, ALLSTATE IS ENTITLED TO PARTIAL SUMMARY**
25  **JUDGMENT OF THE BAD FAITH CLAIM**

26          Even if the Court were to find a triable issue of fact regarding Allstate's coverage

27  obligations, it nevertheless should grant partial summary judgment as to Ricotta's bad faith

28  claim.

                                    14              Case No.  CV-02-0659 K (JFS)

1    The mere fact that an insurance company withholds benefits does not establish a

2    breach of the implied covenant of good faith and fair dealing.   Instead, a plaintiff must

3    show that the benefits were withheld unreasonably or "without proper cause."

4          Indeed, the implied covenant requires insurers only to be reasonable, not perfect.

5    Mistaken judgment is not bad faith.   Rather, "[b]ad faith implies dishonesty, fraud and

6    concealment."   To constitute bad faith, the insurer's conduct must demonstrate "a failure

7    or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad

8    judgment or negligence but rather by a conscious and deliberate act . . . ." <u>Chateau</u>

9    <u>Chamberay Homeowners Assn. v. Associated International Ins. Co.</u>, 90 Cal. App. 4th 335,

10   346 (2001) (affirming summary judgment on bad faith claim) (citation and quotations

11   omitted).

12         It is not bad faith "for an insurer to resolve good faith doubts about the claim

13   against the claimant." <u>Cardiner v. Provident Life & Accident Ins. Co.</u>, 158 F. Supp. 2d

14   1088, 1105 (C.D. Cal. 2001); <u>Phelps v. Provident Life & Accid. Ins. Co.</u>, 60 F. Supp. 2d

15   1014, 1022 (C.D. Cal. 1999).   To the contrary, the implied covenant allows the insurer to

16   "'give its own interests consideration equal to that it gives the interests of its insureds.'"

17   <u>Fraley v. Allstate Ins. Co.</u>, 81 Cal. App. 4th 1282, 1293 (2000) (citation omitted).

18   Therefore, the insurer has a right to dispute an insurance claim -- without fear of bad faith

19   liability -- so long as it has a reasonable basis to do so. <u>Id.</u>

20         It is now settled law in California that an insurer denying payment of policy benefits

21   due to the existence of a genuine dispute with its insured as to the existence of coverage

22   liability is not liable in bad faith even though it might be liable for breach of contract.

23   <u>Chateau Chamberay</u>, 90 Cal. App. 4th at 347.

24         The court can make this determination on summary judgment. <u>Id.</u> ("It is equally

25   clear that this issue may be resolved as a matter of law in a proper case.  "[A] court can

26   conclude as a matter of law that an insurer's claim is not unreasonable, so long as there

27   existed a genuine issue as to the insurer's liability"); <u>Dalrymple v. United Services Auto</u>

28   <u>Assn.</u>, 40 Cal.App.4th 497, 523, 46 Cal.Rptr.2d 845 (1995) (jury verdict reversed: "[t]he

1   trial court should have ruled as a matter of law, and we now determine, there was a

2   genuine issue as to coverage . . ."); <u>Guebara v. Allstate Ins. Co.</u>, 237 F.3d 987, 992 (9th

3   Cir. 2001) (affirming summary judgment); <u>Fraley</u>, 81 Cal. App. 4th at 1292 (affirming

4   summary judgment).

5          The genuine dispute doctrine applies with particular force where the insurer's

6   position was based on expert opinion. <u>Chateau</u>, 90 Cal. App. 4th at 347-48; <u>Allstate v.</u>

7   <u>Madan</u>, 889 F.Supp. 374, 380 (C.D. 1995). This is true regardless of whether the expert's

8   opinion is ultimately accepted by the trier of fact. <u>Fraley</u>, 81 Cal. App. 4th at 1292;

9   <u>Guebara</u>, 237 F.3d at 993.

10          In <u>Guebara</u>, for example, the insurer relied on fire cause-and-origin experts who had

11   suggested that the insured misrepresented the extent of belongings destroyed in the fire.

12   The jury rejected this expert evidence and found the insurer liable for contract damages.

13   Still, the Ninth Circuit affirmed summary judgment as to the bad faith claim because of the

14   insurer's reliance on expert opinions:

15          Likewise, in <u>Fraley</u>, the insurer and the insured disputed the cost of repairing certain

16   property damage. Both sides retained construction experts who provided substantially

17   different opinions on the value of the claim. Because the experts disagreed, the parties

18   submitted the dispute to appraisal (a form of arbitration required by the insurance

19   contract). Even though the arbitrator rejected the insurer's experts' opinions and awarded

20   the insured much more than the insurer had offered, the Court of Appeal held that the

21   genuine dispute doctrine barred the bad faith claim. <u>Fraley</u>, 81 Cal. App. 4th at 1287, 1293

22   ("Where the parties rely on expert opinions, even a substantial disparity in estimates for

23   the scope and cost of repairs does not, by itself, suggest the insurer acted in bad faith.");

24   <u>Accord</u>, <u>Chateau</u>, 90 Cal.App.4th at 347-48.

25          Courts routinely apply the genuine dispute doctrine to claims where insurers rely

26   upon experts to determine the source of damages to an insured's home. <u>E.g.</u>, <u>Adams v.</u>

27   <u>Allstate Ins. Co.</u>, 187 F. Supp. 2d 1207, 1211, 1215 (C.D. Cal. 2002) (summary judgment

28   / / /

1    granted); companion case, <u>Adams v. Allstate Ins. Co.</u>, 187 F. Supp. 2d 1219, 1228-30

2    (C.D. Cal. 2002) (summary judgment granted).

3       In the companion <u>Adams</u> cases, for example, the insurer relied upon expert findings

4    to conclude that ongoing blasting at a nearby reservoir had not caused damages to the

5    plaintiffs' homes.  In both cases, the plaintiffs had undisputed cracking and other damages,

6    and the insureds believed that the blasting had caused the damages.  The court nevertheless

7    found that the insurer's reliance on the experts' opinions created a genuine dispute as to

8    the cause of the damages. <u>Adams</u>, 187 F.Supp.2d at 1211, 1215; <u>Adams</u>, 187 F.Supp.2d at

9    1228-30. <u>See also</u>, <u>Rigas v. Allstate Ins. Co.</u>, 1998 U.S. Dist. LEXIS 6192 *3, 7 (C.D.

10    Cal. 1998) (summary judgment granted: Insurer was entitled to rely upon experts' findings

11    that soil movement damages were not caused by the Northridge earthquake, even though

12    plaintiff submitted an expert report to the contrary.); <u>Paine v. Allstate Ins. Co.</u>, 1996 U.S.

13    Dist. LEXIS 6407 *2-4 (C.D. Cal. 1996) (partial summary judgment granted: Insurer was

14    entitled to rely upon expert findings to determine whether damages to the insured's home

15    resulted from the Northridge earthquake or an aftershock.).

16       This case presents an even stronger candidate for application of the "genuine

17    dispute" doctrine, because in almost all of the above cases, the insured had an expert that

18    contradicted the expert relied on by the insurer.  Here, Ricotta doesn't have any opinion

19    that contradicts the opinions of Earthquake Engineering.

20       Earthquake Engineering concluded that Ricotta's loss was caused by water intrusion

21    resulting from deficient construction.  This is precisely the same conclusion reached by

22    Allstate's expert, John Price, a registered civil and structural engineer. (Allstate's IOE, Ex.

23    11)  It is also the same conclusion reached by Allstate's contractor and remediation expert,

24    James Mosier. (Allstate's IOE, Ex. 19)  Ricotta does not, because he cannot, refute these

25    conclusions as to causation.  He hasn't even designated an expert to opine on causation.

26    Therefore, there is no evidence that Allstate's reliance on Earthquake Engineering's report

27    was unreasonable; indeed, the only evidence that exists is overwhelmingly to the contrary.

28    / / /

1    Earthquake Engineering also concluded that the home was not in danger of

2    imminent collapse as of the date of his inspection. (Allstate's IOE, Ex. 2, p. 17)  This is

3    precisely the same conclusion reached by Allstate's engineering expert in this case, John

4    Price. (Allstate's IOE, Ex. 11)  Ricotta also cannot refute this contention.  His engineering

5    expert in this lawsuit, William Dost, states only that the home was in danger of imminent

6    collapse *twenty-two months* later, in August 27, 2002.  (Ex. 21)  He testified that he

7    neither had an opinion, nor was he asked to give an opinion, concerning the condition of

8    the property as of an earlier date. (Getchey Decl., ¶ 4; Allstate's IOE, Ex. 20, p. 317)

9    Ricotta has no evidence that the conclusions of Earthquake Engineering were flawed,

10   much less evidence that Allstate's reliance on those conclusions was unreasonable.

11       Because Allstate had a right to rely on an engineering expert, and the conclusions

12   raised doubts as to coverage, as a matter of law Allstate cannot be held liable for bad faith.

13   **VII.   EVEN IF PLAINTIFF COULD PROVE BAD FAITH, HE STILL CANNOT
         ESTABLISH A CLAIM FOR PUNITIVE DAMAGES**

14

15       Even if Ricotta could somehow manufacture an issue of fact to salvage his bad faith

16   claim, his claim for exemplary damages should be dismissed.  Evidence that an insurer has

17   committed bad faith does not thereby establish that it has acted with the requisite malice,

18   oppression or fraud to justify an award of punitive damages.  Tomaselli v. Transamerica

19   Ins. Co., 25 Cal.App.4th 1269, 1285, 31 Cal.Rptr.2d 433 (1994).   On the contrary, it has

20   recently been reaffirmed that "the evidence required to support an award of punitive

21   damages for breach of the implied covenant of good faith and fair dealing is 'of a different

22   dimension' from that needed to support a finding of bad faith."  Shade Foods, Inc. v.

23   Innovative Product Sales & Marketing, 78 Cal.App.4th 847, 909-10 (2000) (emphasis

24   added).  Accordingly, evidence of mere bad faith -- without more -- is insufficient to

25   support a claim for punitive damages.  Beck v. State Farm, 54 Cal.App.3d 347 (1976)

26   ("Proof of a violation of the duty of good faith and fair dealing does not establish that the

27   defendant acted with the requisite intent" to support a claim for punitive damages); Stewart

28   v. Truck Ins. Exch., 17 Cal.App.4th 468, 483 (1993) (same).

1    For example, Beck involves an insurance claim where the insurer (i) asserted

2    "patently untenable" coverage defenses, (ii) consciously decided to assert the untenable

3    coverage position as settlement leverage, even while internally acknowledging the validity

4    of the claim, and (iii) left large portions of the insured's claim "totally unattended." Beck,

5    54 Cal.App.3d at 352, 354-56.   Moreover, the insurer did all this despite knowledge that

6    the insured was unemployed, had no other insurance to cover her medical bills, and was

7    being subjected to economic pressure by the insurer's delay. Id. at 353.   The Court of

8    Appeal held that even these facts – much more egregious than anything even alleged in

9    this case – were insufficient as a matter of law to support punitive damages. Id. at 356

10   (reversing punitive damages award).   Bad faith alone simply is insufficient to sustain a

11   claim for punitive damages.

12       To establish a claim for punitive damages, Ricotta must establish by clear and

13   convincing evidence that Allstate has been guilty of oppression, fraud, or malice." Stewart

14   v. Truck Ins. Exch., 17 Cal.App.4th 468, 481-82 (1993) (plaintiff must come forward with

15   some "clear and convincing evidence" of fraud, oppression or malice to survive summary

16   judgment). See also Shade, 78 Cal.App.4th at 891-92 (citing Stewart with approval on this

17   point).

18       On a motion for summary judgment, "the judge must view the evidence presented

19   through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby,

20   Inc., 477 U.S. 242, 254 (1986); Frazier v. Garrison I.S.D., 980 F.2d 1514, 1520 (5th Cir.

21   1993) (on summary judgment, "[t]he determination of whether a factual dispute exists

22   must be governed by the substantive evidentiary standards that apply to the case").

23       Thus, for Ricotta's punitive damages allegations to survive, he must provide clear

24   and convincing evidence that Allstate is guilty of fraud, oppression or malice.  Id.; Board

25   of Trustees of Univ. of Illinois v. Ins. Corp. of Ireland, 969 F.2d 329, 332 (7th Cir. 1992)

26   (applying "clear and convincing" standard on summary judgment motion).   Clear and

27   convincing evidence is evidence "sufficiently strong to command the unhesitating assent of

28   every reasonable mind." In re Angelia P., 28 Cal.3d 908, 919 (1981).

1  Moreover, Ricotta must not merely present evidence that is consistent with the

2  hypothesis of malice, fraud or oppression.  Rather, he must present clear and convincing

3  "evidence that is inconsistent with the hypothesis that the tortious conduct was the result of

4  a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or

5  other such non-iniquitous human failing." Tomaselli v. Transamerica Ins. Co., 25

6  Cal.App.4th at 1288, fn. 14 (1994).

7  "'Oppression' means despicable conduct that subjects a person to cruel and unjust

8  hardship in conscious disregard of the person's rights." Cal. Civ. Code § 3294(a)(2).

9  "'Despicable conduct' is conduct which is so vile, base, contemptible, miserable, wretched

10  or loathsome that it would be looked down upon and despised by ordinary decent people."

11  Stewart, 17 Cal.App.4th at 483 n. 29.

12  In order to show "fraud," a plaintiff must show "an intentional misrepresentation,

13  deceit or concealment of a material fact known to the defendant with the intention on the

14  part of the defendant of thereby depriving a person of property or legal rights or otherwise

15  causing injury." Cal. Civ. Code § 3294(c).

16  In order to show "malice", a plaintiff must show "conduct which is either (1)

17  intended by the defendant to cause injury or (2) despicable conduct which is carried on by

18  the defendant with a willful and conscious disregard for the rights and safety of others."

19  Cal. Civ. Code § 3294(c)(1).  "Malice implies an act conceived in a spirit of mischief or

20  with criminal indifference towards the obligations of others." Kendall Yacht Corp. v.

21  United Cal. Bank, 50 Cal.App.3d 949, 958 (1975).  "Evil motive is the central element of

22  the malice which justifies an exemplary award." O'Hara v. Western Seven Trees Corp., 75

23  Cal.App.3d 798, 806 (1977).  "Consequently, to establish malice, it is not sufficient to

24  show only that the defendant's conduct was negligent, grossly negligent or even reckless."

25  Bell v. Sharp Cabrillo Hosp., 212 Cal.App.3d 1034, 1044 (1989).

26  In fact, in the context of insurance claims handling, California courts have held that

27  even "shoddy" and "witless" practices are insufficient to justify an award of punitive

28  damages. Patrick v. Maryland Casualty Co., 217 Cal.App.3d 1566, 1576 (1990).

1    Here, Ricotta cannot produce any evidence, let alone clear and convincing evidence,

2    that justifies an award of punitive damages.  Accordingly, Ricotta's punitive damage

3    allegations fail as a matter of law.

4    DATED: August 8, 2003         LUCE, FORWARD, HAMILTON & SCRIPPS LLP

5

6                                 By:

7                                     Ronald D. Getchey
                                      Attorneys for Defendant ALLSTATE
8                                     INSURANCE COMPANY

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | Peter H. Klee, State Bar No. 111707
2 | Ronald D. Getchey, State Bar No. 157213
Valerie R. Cardenas, State Bar No. 157031
LUCE, FORWARD, HAMILTON & SCRIPPS LLP
3 | 600 West Broadway, Suite 2600
San Diego, California 92101-3372
4 | Telephone No.: 619.236.1414
Fax No.: 619.232.8311

5

6 | Attorneys for Defendant
ALLSTATE INSURANCE COMPANY

7

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10

11 | LANCE RICOTTA,                              Case No. CV 02-0659K (JFS)

12 |         Plaintiff,                          **DECLARATION OF SERVICE**

13 | v.

14 | ALLSTATE INSURANCE COMPANY,
and DOES 1 through 50, inclusive,

15

16 |         Defendants.

17

18 |         I, the undersigned, declare as follows:

19 |         I am employed with the law firm of LUCE, FORWARD, HAMILTON & SCRIPPS

20 | LLP, whose address is 600 West Broadway, Suite 2600, San Diego, California 92101-

21 | 3391. I am over the age of eighteen years, and am not a party to this action.

22 |         On August 11, 2003, I caused to be served the following document(s):

23 | **DEFENDANT ALLSTATE INSURANCE COMPANY'S NOTICE OF
MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE**
24 | **ALTERNATIVE PARTIAL SUMMARY JUDGMENT**

25 | **POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
ALLSTATE INSURANCE COMPANY'S MOTION FOR SUMMARY**
26 | **JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY
JUDGMENT;**

27

28 | ///

1

Case No. CV 02-0659K(JFS)
DECLARATION OF SERVICE

1

2

**INDEX OF EXHIBITS IN SUPPORT OF DEFENDANT ALLSTATE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT;**

3

4

5

**DECLARATION OF RONALD D. GETCHEY IN SUPPORT OF DEFENDANT ALLSTATE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT;**

6

7

**DECLARATION OF H. JOHN PRICE IN SUPPORT OF DEFENDANT ALLSTATE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT;**

8

9

10

**DECLARATION OF JAMES MOSIER IN SUPPORT OF DEFENDANT ALLSTATE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT;**

11

12

**DECLARATION OF MARGIE JEWETT IN SUPPORT OF ALLSTATE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT;**

13

14

**[PROPOSED] ORDER GRANTING ALLSTATE'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

15   on the below parties in this action by placing a true copy (copies) thereof in a separate

16   envelope(s), addressed as shown, for collection and mailing on the below indicated day

17   pursuant to the ordinary business practice of this office which is that correspondence for

18   mailing is collected and deposited with the United States Postal Service on the same day in

19   the ordinary course of business:

20   [X]   by placing [ ] the original [X] a true copy thereof served in the following manner

21

22   Craig A. Miller, State Bar No. 116030
LEVINE, STEINBERG, MILLER & HUVER
550 West C Street, Suite 1810

23   San Diego, California 92101
Telephone: (619) 231-9449

24   Facsimile:  (619) 231-8638
*Attorney for Plaintiff.*

25

26   [X ]   (BY **MAIL SERVICE**) I placed such envelopes for collection and to be mailed on

27   this date following ordinary business practices.

28

Case No. CV 02-0659K(JFS)
DECLARATION OF SERVICE

1   [ ]   (BY **PERSONAL SERVICE**) I caused to be delivered such envelope by hand to

2         the office of the addressee via Cal-Express Messenger Service.

3   [ ]   (BY **FACSIMILE**) The document stated herein was transmitted by facsimile

4         transmission and the transmission was reported as complete and without error.

5   [ ]   (BY **FEDERAL EXPRESS MAIL - SECOND DAY DELIVERY**) I caused to be

6         delivered such envelope by hand to the office of the addressee.

7         I declare under penalty of perjury under the laws of the United States of America

8   that the foregoing is true and correct.  I declare that I am employed in the office of a

9   member of the bar of this court at whose direction the service was made.

10        Executed on August 11, 2003, at San Diego, California.

11

12

13   _Anne Vaughan._
     ANNE VAUGHAN

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3                    Case No. CV 02-0659K(JFS)
                     DECLARATION OF SERVICE